IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THOMAS KOST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-25-RP |
| | § | |
| RICKY COTTO, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court is Defendant Ricky Cotto's ("Cotto") motion for summary judgment, (Dkt.

16), and associated briefing (Resp., Dkt. 19; Reply, Dkt. 21). After considering the parties'

arguments, the facts in the record, and the relevant law, the Court denies Cotto's motion.

## I.  BACKGROUND

This case arises from a traffic stop during which Cotto, a Texas Department of Public Safety

patrol officer, detained Plaintiff Thomas Kost ("Kost") on the side of the highway. (Compl., Dkt. 1,

at 2–7). Kost alleges that Cotto unreasonably searched and seized him "without reasonable suspicion

and without probable cause, violating the Fourth Amendment." (*Id.* at 7). Kost brings claims under

42 U.S.C. § 1983, seeking a declaratory judgment under 42 U.S.C. § 1988 that Cotto violated his

constitutional rights as well as compensatory and punitive damages. (*Id.* at 8–9). Cotto, in response,

maintains that his actions were objectively reasonable under clearly established law, entitling him to

qualified immunity. (Mot. Summ. J., Dkt. 16, at 4–8).[1]

---

[1] Cotto chose not to request that the Court require Kost to file a reply tailored to Cotto's qualified immunity defense. *See Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016); *Schultea v. Wood*, 47 F.3d 1427, 1433–34 (5th Cir. 1995).

Cotto was wearing a body camera which recorded the entire traffic stop with clear video and sound. The parties do not dispute that the recording is accurate.[2] (Mot. Summ. J., Dkt. 16, at 2 ("Cotto's DPS patrol unit dash-mounted video camera was functioning and captured the encounter."); Resp. Mot. Summ. J., Dkt. 19, at 1 (attaching recording as exhibit)); *see generally Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (courts should rely on "a videotape capturing the events in question"). Cotto was aware the camera was recording. (*See* Body Camera Recording, Def.'s Ex. 2, Dkt. 16-3, at 26:19 (Cotto repeatedly taps camera when speaking with other officers)). Cotto appears to have been wearing the camera on his torso. The recording was taken at night, but the area it depicts is well-lit from several light sources including Cotto's car lights and flashlight. (*See* Mot. Summ. J., Dkt. 16, at 2 (traffic stop began at about 8:50 p.m.); *cf.* Cotto Aff., Def.'s Ex. 1, Dkt. 16-2, at 2 ("It was very dark with limited visibility on the side of the road.")).

Kost was riding his motorcycle from Georgetown to his home in Pflugerville on the night of May 22, 2018, when Cotto pulled him over. (Mot. Summ. J., Dkt. 16, at 1). Kost was traveling at about 90 m.p.h. on a road with a speed limit of 80 m.p.h. (*Id.*). Cotto did not notice anything that seemed suspicious to him about the way in which Kost pulled over, Kost's position on his motorcycle after stopping, or the way in which Kost got off his motorcycle. (Cotto Dep., Pl.'s Ex. 3A, Dkt. 19-3, at 1:30–1:51, 4:24–4:40). An unnamed officer accompanied Cotto throughout the stop and approached Kost alongside Cotto—a salient fact Cotto omits from his motion.[3] (Body Camera Recording, Def.'s Ex. 2, Dkt. 16-3; Mot. Summ. J., Dkt. 16, at 2–3).

---

[2] Cotto argues that "Kost's response relies heavily upon his interpretation of the dash cam and body cam videos" but that Kost "appears to attempt to contradict what is shown on the videos in his affidavit." (Reply Mot. Summ. J., Dkt. 21, at 1; *see* Kost Aff., Pl.'s Ex. 2, Dkt. 19-2). Cotto does not identify any specific portions of Kost's affidavit that contradict the body camera recording. (*See* Reply Mot. Summ. J., Dkt. 21). While Kost's affidavit contains both statements of the facts of this case as he recalls them and conjectures (i.e., "[n]o one would mistake the feel of the items I had in my pockets for weapons"), (*see* Kost Aff., Pl.'s Ex. 2, Dkt. 19-2, at 2), the factual statements are consistent with the body camera recording.
[3] Cotto also did not attach an affidavit from the unnamed officer to his motion.

After Cotto pulled Kost over, he stopped his car about one or two car lengths behind Kost on the right side of the road.[4] (Body Camera Recording, Def.'s Ex. 2, at 0:45). Cotto, Kost, and their vehicles were each in the paved strip of the road separated by a solid line from the main roadway, with tall grass to the right. (*Id.*). Cotto ordered Kost to get off the motorcycle, take off his helmet, and stand in a certain place next to the tall grass by the side of the road, each of which Kost promptly did, verbally acknowledging Cotto's orders. (*Id.* at 0:41–1:06). Kost stood several feet in front and to the right of his motorcycle, facing Cotto. (*Id.* at 1:12). Cotto stood in front of Kost, facing him, with a clear view of the motorcycle behind Kost to the left.

Kost was wearing a short-sleeved polo shirt that extended over his waistline, a leather vest with several patches, and somewhat baggy jeans. (*Id.*). Kost's gaze was generally directed in Cotto's direction, though he looked over at the other officer when the latter walked near him. (*Id.* at 1:01–1:12). Kost's face and body were illuminated by bright light from Cotto's car's headlights, Cotto's flashlight, the unnamed officer's flashlight, or streetlights further down the road. (*Id.*). Cotto asked Kost if he had a driver's license; Kost answered "yes, sir," reached into his pocket, and pulled out his wallet, removing the driver's license. (*Id.* at 1:09–1:17). Cotto ordered Kost to "give me that," referring to the license. (*Id.*). Cotto then asked Kost a series of questions concerning his destination, his insurance, the speed limit, his motorcycle club,[5] whether Kost had been drinking, Kost's past arrest decades ago, and whether Kost had any contraband on his person or his motorcycle. (*Id.* at

---

[4] In this section, references to relative directions like "left" and "right" refer to Cotto's perspective.
[5] Cotto argues that "there is no evidence that Trooper Cotto was 'profiling' Kost due to his motorcycle club attire." (Reply Mot. Summ. J., Dkt. 21, at 1). Cotto appears to be responding to a portion of Kost's affidavit. (Kost Aff., Pl.'s Ex. 2, Dkt. 19-2, at 3 ("[I]t seemed to me like I was pulled over and held there because of my motorcycle club vest.")). But Kost's response contains no argument that he was stopped because of his motorcycle club attire. (*See* Resp. Mot. Summ. J., Dkt. 19). Cotto's mention of this issue is thus misplaced.

1:17–3:08). Cotto also asked for Kost's insurance card, (*id.* at 1:43), and stated that Kost's eyes appeared "glassy," (*id.* at 2:32).[6]

At various points during this interaction, Kost looked away from Cotto and toward the unnamed officer when the latter was standing close to him and moved. (*See, e.g., id.* at 1:23, 1:38, 2:10, 2:20). Kost tended to look at the unnamed officer when responding to the unnamed officer's questions or after answering one of Cotto's questions. (*See, e.g., id.* at 1:25). Kost also looked away from Cotto soon after a car or truck loudly passed nearby. (*See, e.g., id.* at 1:38). At times, Kost also glanced away from Cotto in a manner consistent with typical conversational mannerisms. For instance, Kost looked up, as if in thought, when recalling the speed limit, estimating the time since he had last consumed alcohol, recalling how long he had been awake that day, and recalling the details of a time he had been arrested decades ago, each in response to Cotto's questions. (*Id.* at 2:02, 2:18, 2:32, 2:42, 2:57). Kost occasionally looked at the unnamed officer after answering Cotto's questions; often, the unnamed officer cocked his head or smiled to acknowledge Kost's glance. (*See, e.g., id.* at 3:01, 3:14). Kost also looked away from Cotto when retrieving documents from his wallet. (*See, e.g.,* 1:42). And Kost looked away from Cotto, for about three seconds, after Cotto asked him why he was "rolling so fast." (*Id.* at 1:53–1:56). For nearly all of the remaining period of this portion of their interaction, though, the recording shows that Kost's gaze was firmly directed in Cotto's direction. When Kost did look away from Cotto, he rarely turned to look at his motorcycle, which was generally behind him.

Cotto then asked Kost if he "had any objections to [Cotto] searching the motorcycle." (*Id.* at 3:11). Kost moved his eyes back and forth, as if in thought, and responded that "I don't consent to

---

[6] As Kost notes, Cotto's affidavit alleges that Kost had "bloodshot" eyes, and does not mention any perceived "glassiness." (Cotto Aff., Def.'s Ex. 1, Dkt. 16-2, at 2; *see* Resp. Mot. Summ. J., Dkt. 19, at 9 n.2). It is not definitively clear from the recording whether Kost indeed had either bloodshot or glassy eyes, though his scleras appear white. (*Cf.* Resp. Mot. Summ. J., Dkt. 19, at 9 ("[T]here are several clear shots of Kost's eyes on the body camera video.")).

any searches, but there's nothing, nothing illegal." (*Id.* at 3:14). Cotto then told Kost to wait where he was, approached the motorcycle with his flashlight, and looked at it from various angles. (*Id.* at 3:25–3:44). The unnamed officer can be heard asking Kost if he "was a part of that, at Waco" and if he knew anyone involved in that incident, to which Kost responds that he "had some friends who were there."[7] (*Id.*).

Next, Cotto asked Kost if he had any weapons on his person. (*Id.* at 3:45). Kost replied "no." (*Id.* at 3:46). The unnamed officer was standing a few feet from Kost. (*Id.*). Cotto told Kost he would pat him down for weapons "to keep the scene safe." (*Id.* at 3:50). Kost immediately raised his hands in the air. (*Id.* at 3:51). Cotto ordered Kost to turn around and put his hands on his head, which Kost immediately did. (*Id.* at 3:51–3:56). Cotto patted Kost's left front pocket and asked him again if there were any weapons on the motorcycle. (*Id.* at 4:08). Kost volunteered that he had a pocketknife; when Cotto asked where it was, Kost replied that it was in his right front vest pocket. (*Id.* at 4:09–4:12). Cotto continued to pat Kost's left front vest pocket and legs. (*Id.* at 4:13–4:22). Feeling something on Kost's person, Cotto asked him what it was. (*Id.* at 4:20). Kost answered that "it's different things, it's not a weapon." (*Id.* at 4:22). Cotto then said "it feels like it could be a weapon" and asked Kost to "pull that out, because I'm not too comfortable with that." (*Id.* at 4:25–4:31; *cf.* Cotto Aff., Def.'s Ex. 1, Dkt. 16-2, at 2 ("I continued with the pat down but each time I felt something suspicious, I asked Mr. Kost to identify it. He did so by pulling items from his pocket.")). The unnamed officer approached Kost and stood a few feet away from him with his hand on his gun. (Body Camera Recording, Def.'s Ex. 2, at 4:25–4:31). Cotto allowed Kost to step away, turn around, and begin opening his right front vest pocket, reiterating that he was "not too comfortable."

---

[7] *See generally* Statement, McClennan County, Texas Criminal District Attorney Barry Johnson, *Re: May 17, 2015, Incident at Twin Peaks Restaurant in Waco, Texas* 1 (Apr. 2, 2019), https://bloximages.chicago2.vip.townnews.com/wacotrib.com/content/tncms/assets/v3/editorial/e/6a/e6 a34594-b030-535f-8d4e-7c8c3144b6d0/5ca45a5a915e5.pdf.pdf.

(*Id.* at 4:32–4:37). The unnamed officer, standing behind Kost and to his right, removed his gun from its holster. (*Id.* at 4:38). Kost pulled out the contents of his right front vest pocket and the unnamed officer put away his gun. (*Id.* at 4:39–4:43). Kost explained that it was "just a condom and a coozie," showing them to Cotto as Cotto shined his flashlight on them. (*Id.* at 4:43–45).

Cotto then continued to pat Kost's vest pockets, asking him what was in his left front vest pocket. (*Id.* at 4:48–4:50). Kost, replacing the items he had removed from his right front vest pocket, said it was "like, my glasses, and a couple other sundry things." (*Id.* at 4:54–4:56). Unprompted, and without objection by Cotto, Kost reached into his pocket and removed the objects, a glasses case and a pocket-sized copy of the Constitution and the Declaration of Independence. (*Id.* at 5:00–5:08). Cotto asked what they were, acknowledged the answer, and continued patting Cotto's left front vest pocket and legs. (*Id.* at 5:06–5:08). Cotto then ordered Kost to wait where he was, explaining that "we've got to make sure the scene is safe," which Kost acknowledged by saying "I understand." (*Id.* at 5:12–5:19). Leaving the unnamed officer with Kost, Cotto returned to his car. (*Id.* at 5:20–25). At no point did Cotto remove, ask Kost to remove, or take possession of Kost's pocketknife.

Cotto sat in the driver's seat of his car, running Kost's license and insurance information. (*Id.* at 5:25–7:10). Kost is not visible in the recording during this time. (*Id.*). Cotto describes Kost as having "kept looking toward my patrol car and then looking back at his motorcycle," "refocusing on the saddlebags located on his motorcycle," and "touching his face with his hands and wiping his mouth and popping his knuckles." (Cotto Aff., Def.'s Ex. 1, Dkt. 16-2, at 2). Cotto then made a beckoning gesture toward the front of his car. (Body Camera Recording, Def.'s Ex. 2, Dkt. 16-3, at 7:10). He lowered the passenger's side window to speak to the unnamed officer, who stood outside the car, leaving Kost alone several feet away. (*Id.* at 7:11–7:19). Cotto and the unnamed officer ("UO") had the following conversation:

> Cotto: You're talking to him now. Is he still pretty nervous?
> UO: Yeah, he's just hesitant.

6

> Cotto: He's really—he's really nervous, right?
> UO: Yeah.
> Cotto: He keeps looking at the bike too.
> UO: Yeah.
> Cotto: I'm gonna call for, I'm gonna call for—
> UO: Canine?
> Cotto: Yeah. I'm gonna call for a canine. Why don't I interview him, right, can you call for a canine?
> UO: Yeah, yeah, yeah.

(*Id.* at 7:20–7:28). In his later description of this conversation, Cotto stated that "[t]he Trooper that I was with also stated that Mr. Kost was exhibiting signs of excessive nervousness in his body language." (Cotto Aff., Def.'s Ex. 1, Dkt. 16-2, at 2).

Cotto then approached Kost, who was standing in the same place. (Body Camera Recording, Def.'s Ex. 2, Dkt. 16-3, at 7:58). He told Kost that "you seem awfully nervous to me," and Kost responded "I'm fine." (*Id.* at 8:00–8:05). Cotto said "it's just in your speech, you keep looking away, having a hard time making eye contact." (*Id.* at 8:07–8:11). Kost did not answer, but cocked his head, looking steadily in Cotto's direction. (*Id.* at 8:10–8:17). Cotto said "I feel like you might be hiding something. That's the way I feel." (*Id.* at 8:17–8:22). Kost shrugged, still looking in Cotto's direction, and replied "I'm sorry you feel that way. It's not the case." (*Id.* at 8:22–8:25). Cotto said "well, you've already said you don't consent, but I gotta be sure, OK? So, I'm going to be requesting a canine. If a canine comes out here and a canine alerts, we'll go from there." (*Id.* at 8:27–8:40). When Cotto first said the word "canine," Kost looked at the ground, then back up at Cotto. (*Id.* at 8:36–8:38).

Kost said "you know what, I don't have anything, you can go ahead," pointing at the motorcycle. (*Id.* at 8:38–8:45). Cotto responded that "nah, nah, we're not going to do that. I already said. I've already made a decision. Now, if a canine can't make it, we'll go from there. But if a canine can make it, we've already made a decision. I do know case law. You've already said you don't feel

comfortable. I'm gonna respect your rights one hundred percent." (*Id.* at 8:45–9:03). Kost replied "I don't have anything, so I'm not worried about it." (*Id.* at 9:04–9:08).

Cotto then questioned Kost about his Kost's insurance coverage, the speed limit, and whether the motorcycle rode "smooth" at high speeds, and the copy of the Constitution Kost carried. (*Id.* at 9:08–11:06). Cotto told Kost he would be receiving a citation for speeding. (*Id.* at 10:26–10:28). The unnamed officer approached and discussed the availability of a canine unit with Cotto; the two then left Kost and walked toward their car. (*Id.* at 11:08–11:45).

Cotto and the unnamed officer continued to discuss the incident in their car. "As soon as I told him that I was requesting a canine, he said 'nah, you can search it.' Because he understands case law. He's carrying the Declaration of Independence around, so he knows case law. And he knows that if I tell him that I'm gonna call a canine, if he says 'well, there's nothing in here, you can search it,' that's highly probable that . . . he can have a case for being coerced." (*Id.* at 12:00–12:40). He reiterated his belief that Kost was "very nervous." (*Id.* at 12:53). The unnamed trooper asked how Kost could claim coercion. Cotto explained his belief that if he told Kost he was calling for a canine unit without actually intending to do so, it could constitute coercion, potentially leading to suppression of evidence. (*Id.* at 13:10–13:51). Cotto again stated that Kost looked "extremely nervous." (*Id.* at 14:38). The unnamed officer mentioned the point in the interaction when Cotto said "what is that in your pocket," and Cotto responded that at that point, "we had to post up and be careful." (*Id.* at 14:42–14:58).

Cotto and the unnamed officer then waited for a canine unit to arrive. Cotto, speaking on the phone, mentioned that "my time is ticking away here." (*Id.* at 16:07). Cotto honked the car horn multiple times and gestured toward the front of the car. (*Id.* at 16:55–17:00). Cotto then explained to the unnamed officer that "I don't let people make calls because I don't know if they're calling for backup." (*Id.* at 17:00–17:03). The unnamed officer agreed: "next thing you know, you've got 12

bikes rolling up on us, and then what?" (*Id.* at 17:11). They kept discussing the incident over the next few minutes. Cotto, retelling the situation on the phone to an unknown interlocutor (likely a canine unit), said "he got off the bike, he's fairly compliant, but just overly nervous . . . got him away from his bike but he's kind of looking back and forward at the bike, kind of evasive in his speech toward me, just giving me the impression." (*Id.* at 22:08–22:42). Cotto said that Kost was "very cooperative," and that he "asked anybody else, other than you, to don't come out here." (*Id.* at 23:21–23:30).

A few minutes later, Cotto and the unnamed officer got out of the car to speak to another officer who had arrived behind their car, leaving Kost about two car lengths away. (*Id.* at 25:54). Cotto told the other officer that "I don't want to get anybody else involved. . . . The less cops, the better." (*Id.* at 26:08–26:14). He then patted his body camera repeatedly, saying "we'll talk some more about it. . . . Trust me, the less the better on this one." (*Id.* at 26:19–26:27).

Cotto then approached Kost to explain the situation. Kost was standing with his hands on his hips as Cotto said "hopefully, we'll get you out of the way." (*Id.* at 27:07–27:25). Cotto told Kost that he had confirmed Kost's insurance status and that inability to provide a copy would result in a warning only. (*Id.* at 28:17–28:28). Kost offered to use his phone to find a copy and Cotto encouraged him to do so. (*Id.*). As Kost searched for insurance verification on his phone, Cotto twice turned his back on Kost. (*Id.* at 29:16, 33:15).

The canine unit arrived. Its dog sniffed various parts of the motorcycle without alerting. (*Id.* at 33:38–34:40). Cotto then spoke with the dog's handler for a few minutes. (*Id.* at 34:40–37:00). He subsequently printed the speeding citation and gave it to Kost. (*Id.* at 38:05–39:05). After Kost confirmed his personal information, the body camera recording concluded. (*Id.* at 39:16–40:31).

## II.  LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995).

Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmoving party is required to identify specific evidence in the record and to articulate the precise way that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 allows the court to "consider other materials in the record" in addition to what the parties cite as evidence. Fed R. Civ. P. 56(c)(3). But it does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmoving party's opposition to the motion for summary judgment. *Adams*, 465 F.3d at 164.

After the nonmoving party has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find in its favor, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000). When the nonmoving party does not respond, the Court treats the facts the moving party has raised as "undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2); *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Even when considering a qualified immunity defense, however, the court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the nonmoving party's favor. *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993). It may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In the context of a pretrial motion, the applicable standard of review limits the Court's ability to conclusively determine whether an officer is entitled to qualified immunity. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (holding that at summary judgment, a court cannot resolve fact disputes pertaining to either prong of qualified immunity in favor of the moving party).

When video evidence is in the record, and the "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380; *see also id.* at 381 (the court should "view[] the facts in the light depicted by the videotape"); *Guerra v. Bellino*, 703 F. App'x 312, 316 (5th Cir. 2017) ("Video evidence can be dispositive on a motion for summary judgment."). But when one party's version of events does not "blatantly contradict" the recording, the typical summary judgment standard applies.

11

*Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013); *see also Garcia v. City of Buda*, No. 1:17-CV-377-RP, 2018 WL 6682419, at *3 (W.D. Tex. Dec. 19, 2018). "[T]he standard imposed by the Supreme Court [in *Scott*] is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 730 (5th Cir. 2018).

### III.  ANALYSIS

"At the outset, the Court highlights the significance of the body camera footage." *Vasquez v. Landon*, No. 4:18-CV-00340-P, 2020 WL 905360, at *1 (N.D. Tex. Feb. 25, 2020). To grant Cotto summary judgment, the Court must find that no reasonable juror, viewing this footage, could find that Cotto violated Kost's constitutional rights. That is not possible at this stage. "The presence of the fact issue[s] created by the body camera footage [are] sufficient to deny summary judgment." *Id.* The Court does not explicitly find that either party's account "blatantly contradict[s]" the recording, and so views the evidence in the record, including the recording, in the light most favorable to Kost, the nonmoving party. *Ramirez*, 716 F.3d at 374. However, the Court also "view[s] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 381.

Cotto argues that he is entitled to qualified immunity because his actions during the stop were "objectively reasonable" and "there is no clearly established caselaw directly on point that would tell [him] that his actions were unconstitutional." (Mot. Summ. J., Dkt. 16, at 4 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Since Cotto invoked qualified immunity, the burden shifts to Kost to establish a genuine fact issue about whether Cotto's conduct violated clearly established law. *See Brown*, 623 F.3d at 253. Kost does so by contending that the body camera recording reveals disputed material facts tending to show that Cotto's actions were not objectively reasonable under clearly established law, precluding summary judgment. (Resp. Mot. Summ. J., Dkt. 19, at 2).

Specifically, Kost identifies five disputed facts that he believes are material: that his "eyes were neither bloodshot nor glassy during the traffic stop"; that he "did not consent to the rummaging of his pockets, but complied with Cotto's orders for what was supposed to be a frisk for weapons"; that "Cotto did not frisk Kost for weapons, but searched his person generally for evidence"; that Kost "was not 'frozen' in one place, but was obeying Cotto's order to remain where he was standing"; and that "he did not actually, nor did he appear to, repeatedly look at his motorcycle." (*Id.* at 14).

When a government official claims qualified immunity from liability for damages for their allegedly unlawful actions, whether he may yet be liable "generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S. at 818–19). The official's "subjective beliefs about the [action] are irrelevant." *Id.* at 641. Therefore, the relevant inquiry at this point is "the objective (albeit fact-specific) question whether a reasonable officer could have believed [Cotto's actions] to be lawful, in light of clearly established law and the information [Cotto] possessed," viewed in the light most favorable to Kost as the nonmoving party. *Anderson*, 483 U.S. at 641; *see also Tolan*, 572 U.S. at 656; *Rosado*, 5 F.3d at 122–23. Cotto's subjective beliefs about his action's reasonableness are irrelevant. *Anderson*, 483 U.S. at 641. The Court has the discretion to decide the order in which to answer the two questions at issue—of whether Cotto's actions were objectively reasonable and whether the law was clearly established—and elects to do so in the manner set forth below. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## A.  Objective Reasonableness

In analyzing whether Cotto's actions were objectively reasonable for the purposes of summary judgment, the Court first summarizes the law applicable to the scope and duration of traffic stops and weapons frisks, the development of reasonable suspicion in general, and the role a

person's perceived nervousness may play in an officer's development of reasonable suspicion about

him. Then, the Court evaluates Cotto's prolonging the traffic stop and frisking Kost in light of this

law, viewing the evidence as depicted by the body camera recording and in the light most favorable

to Kost as the nonmoving party. The Court concludes that Cotto is not entitled to summary

judgment on the issue of whether he acted objectively reasonably for the purpose of determining

whether he may enjoy qualified immunity.

1. <u>Applicable Law</u>

a.  The Permissible Scope of Traffic Stops and Weapons Frisks

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement

officer has 'a particularized and objective basis for suspecting the particular person stopped of

criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449

U.S. 411, 417–18) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). "[T]he tolerable duration of police

inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic

violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. United States*,

575 U.S. 348, 354 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Because addressing

the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at]

purpose.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).

Officers "may conduct certain unrelated checks during an otherwise lawful traffic stop," but

not in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify

detaining an individual." *Id.* at 355. Typically, the scope of a traffic stop involves "determining

whether to issue a traffic ticket, . . . checking the driver's license, determining whether there are

outstanding warrants against the driver, and inspecting the automobile's registration and proof of

insurance." *Id.* The officer may also "ask questions on subjects unrelated to the circumstances that

caused the stop, so long as these unrelated questions do not extend the duration of the stop." *United*

*States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). Once those tasks have been completed, "or reasonably should have been" completed, "[a]uthority for the seizure thus ends." *Rodriguez*, 575 U.S. at 354. However, "[i]f the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain [the vehicle's] occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Pack*, 612 F.3d at 350.

The Supreme Court held in *Terry* that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he can pat down that person for concealed weapons. 392 U.S. at 24. It has also "recognized that traffic stops are 'especially fraught with danger to police officers.'" *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("[T]he policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect."). Even so, though, the Court has "stressed" that "[t]he risk of harm to both the police and the [vehicle's] occupants . . . is minimized . . . if the officers routinely exercise unquestioned command of the situation." *Johnson*, 555 U.S. at 330 (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)).

"To justify a patdown of the driver or a passenger during a traffic stop . . . just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Id.* at 327. An officer need not have probable cause to arrest to pat down a person during a traffic stop, only reasonable suspicion.[8] *United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000). He "need not be certain that an

---

[8] Cotto states that Kost "consented" to a weapons frisk "by raising his hands" after Cotto asked him if he could pat him down "to keep the scene safe." (Cotto Aff., Def.'s Ex. 1, Dkt. 16-2, at 2.) However, whether or not Kost consented to a frisk is immaterial, since the salient inquiry is whether Cotto had reasonable suspicion to pat Kost down at all.

individual is armed" to perform the search. *United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008). Instead, "the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *Id.* Accordingly, "[w]hen a reviewing court determines that an initial investigatory stop was lawful, it must apply a different, more onerous standard to determine whether an ensuing frisk for weapons was lawful." *United States v. Monsivais*, 848 F.3d 848 F.3d 353, 357 n.1 (5th Cir. 2017) (citing *Johnson*, 555 U.S. at 326–27; *Terry*, 392 U.S. at 27).

During a weapons frisk, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity [as contraband] immediately apparent," the officer may lawfully seize that object. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The officer must immediately recognize the object as contraband: if, searching a person for a weapon, the officer feels an object and instantly knows it not to be a weapon, the officer may not manipulate the object further. *Id.*; *see also United States v. Ponce*, 8 F.3d 989, 999 (5th Cir. 1993). But, if the officer suspects that the object is a weapon, "a more lenient standard should be used in reviewing his suspicions than the high 'immediately apparent' standard applied to suspected contraband." *United States v. Duvall*, 192 F.3d 127, 1999 WL 684140, at *3 (5th Cir. 1999). "[I]f an officer has not ruled out the possibility that a particular object might be a weapon, he is permitted to conduct further examination of that object." *Id.*; *see also United States v. Majors*, 328 F.3d 791, 795 (5th Cir. 2003); *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999).

Still, if "an officer who is executing a valid search for one item seizes a different item," there is a "danger . . . that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *Dickerson*, 508 U.S. at 375 (quoting *Texas v. Brown*, 460 U.S. 730, 748 (1983) (Stevens, J., concurring)). And if the "officer's continued exploration of [the person's] pocket after having concluded that it contained no

weapon was unrelated to '[t]he sole justification of the search[,] . . . the protection of the police officer and others nearby,'" it is unlawful because it was "the sort of evidentiary search that *Terry* expressly refused to authorize . . . and that [the Supreme Court] has condemned in subsequent cases." *Id.* (quoting *Terry*, 392 U.S. at 29).

### b. Developing Reasonable Suspicion

Whether an officer does in fact have reasonable suspicion to prolong the stop and/or frisk a person for weapons "is dependent upon both the content of information possessed by police and its degree of reliability." *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). The standard courts apply when making this determination "takes into account 'the totality of the circumstances—the whole picture.'" *Id.* (quoting *Cortez*, 449 U.S. at 417). "[A] mere 'hunch' does not create reasonable suspicion." *Id.* (quoting *Terry*, 392 U.S. at 27). But "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The Fifth Circuit has discussed in detail the deductive process of developing legitimate reasonable suspicion. In *Monsivais*, the court reasoned that "if the totality of the circumstances prior to the seizure of the defendant does not provide a particularized and objective basis for suspecting the particular person seized of criminal activity, the seizure violates the Fourth Amendment." 848 F.3d at 361–62. Because "drawing a reasonable inference is a logical process of reasoning from known facts," an officer evaluating a person's behavior must have "some articulable premise—some fact linking that behavior to reasonably suspected criminality." *Id.* at 362 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Terry*, 392 U.S. at 21–22). "Without that premise, there can be no objectively logical reason to impute criminality to a lawful range of behavior." *Id.*

Reviewing the facts of the case, the Fifth Circuit concluded that the officers involved did not have reasonable suspicion because there was "no objectively logical path of deduction that [led] to reasonable suspicion of criminal activity at the time of [the person's] seizure and detention." (*Id.* at 363). "[N]either the Government nor the arresting officers ha[d] pointed to an objective fact that is contextually or inherently suggestive of criminal activity by [the person] prior to the pat-down." *Id.* The court held that when "an articulable deductive relationship or connection between facts taken as premises does not form part of an officer's conclusion of criminal suspicion, then that conclusion cannot be objectively logical and can *only* be based on an impermissible intuitive sense or feeling— *i.e.*, a hunch." *Id.*; *see Navarette*, 572 U.S. at 397.

c.  Nervous Behavior and Reasonable Suspicion

"[N]ervous, evasive behavior" is a "pertinent factor" from which officers may deduce reasonable suspicion of criminal activity. *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000). But a person's putatively nervous behavior is not necessarily sufficient, by itself, to establish reasonable suspicion. Indeed, the Fifth Circuit has expressly noted that it has "never held that nervousness alone is sufficient to create reasonable suspicion of criminal activity," and "[i]n fact, [it] often give[s] little or no weight to an officer's conclusory statement that a suspect appeared nervous." *United States v. Portillo-Aguirre*, 311 F.3d 647, 656 n.49 (5th Cir. 2002); *see also United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011); *Monsivais*, 848 F.3d at 359 ("Many other courts look skeptically upon the probative value of an individual's nervousness in assessing whether reasonable suspicion of criminal activity exists."); *accord, e.g.*, *United States v. Howell*, No. 18-3157, 2020 WL 2107934, at *8 (7th Cir. May 4, 2020). Fifth Circuit law emphasizes this point: "nervousness per se carries with it no readily discernible connection to criminal activity" because "[n]ervousness is an 'entirely natural reaction to police presence.'" *Monsivais*, 848 F.3d at 359 (quoting *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005)). "[I]t is common for most people to exhibit signs of nervousness when confronted by a law

enforcement officer whether or not the person is currently engaged in criminal activity." *Id.* (quoting *United States v. Salzano*, 158 F.3d at 1113 (10th Cir. 1998)).

When the Fifth Circuit has accorded nervousness particular weight as one of the factors supporting reasonable suspicion in a particular situation, the person's nervousness typically was severe and readily apparent. *See, e.g., Pack*, 612 F.3d at 345 (person "appeared to be extremely nervous," was "breathing heavily," and had "shaking" hands and a "visibly pulsing" carotid artery); *United States v. Sanford*, 658 F.2d 342, 345 (5th Cir. Unit B Oct. 1981) (similar). Less pronounced nervousness may give rise to reasonable suspicion when combined with other factors like "conflicting stories," *Pack*, 612 F.3d at 361, the place and time of travel, *United States v. Powell*, 137 F. App'x 701, 707 (5th Cir. 2005), a car feature consistent with a modification creating a hiding space for drugs, *United States v. Bams*, 858 F.3d 937, 944 (5th Cir. 2017), and/or "an overwhelming scent of a known masking agent," *United States v. Grier*, 127 F. App'x 712, 715 (5th Cir. 2005); *cf. United States v. Portillo-Aguirre*, 311 F.3d 647, 657 (5th Cir. 2002) (on a bus, a person's "nervous appearance, the position of his luggage, and his erect posture did not amount to reasonable suspicion").

## 2. Prolonging the Stop

Here, the parties do not dispute that Kost was speeding or that Cotto lacked reasonable suspicion to stop Kost for that reason. But they do dispute whether Cotto had reasonable suspicion to extend the traffic stop for longer than it reasonably should have taken for him to complete the tasks typically associated with a traffic infraction. Cotto argues that he "had enough articulable [sic] facts in Mr. Kost's body language, nervousness, failure to give eye contact and speech to give him reasonable suspicion to call for a canine search." (Mot. Summ. J., Dkt. 16, at 8). Cotto also argues that Kost "appeared to be frozen in one position on the ground." (*Id.* at 2). Kost challenges each of these assertions. (Resp. Mot. Summ. J., Dkt. 19, at 14).

The Court agrees with Kost, viewing the facts in the light depicted by the body camera recording and in the light most favorable to Kost as the nonmoving party. The body camera recording does not support Cotto's claims about what happened, leading to the conclusion that each refers to a genuinely disputed fact material to the issue of whether Cotto acted objectively reasonably. *See Scott*, 550 U.S. at 381; *Ramirez*, 716 F.3d at 374. Even though Cotto's body camera recorded clearly, it is difficult to say with certainty from the recording whether Kost was making eye contact with Cotto at any particular moment; still, in nearly every moment when Kost's eyes are visible, the recording shows him looking in Cotto's direction. *Cf. Tellis v. LeBlanc*, No. 18-CV-0541, 2018 WL 6722273, at *3 (W.D. La. Aug. 23, 2018), *report and recommendation adopted as modified,* No. 18-CV-0541, 2018 WL 6006909 (W.D. La. Nov. 14, 2018) ("[B]ody cameras do a good job of capturing high-definition video in the direction in which the cameras are pointed."). Kost's tone of voice was consistently level. Nothing about Kost's "speech" (a concept Cotto does not further elaborate) or demeanor sounds or appears unusual.

Therefore, a genuine dispute of material fact exists on the issue of whether Kost's putative nervousness and demeanor were sufficient, under Fifth Circuit law, to help establish reasonable suspicion to extend the traffic stop. (*See* Cotto Aff., Def.'s Ex. 1, Dkt. 16-2, at 2 ("From my training and experience, I felt I had enough articulable facts in Mr. Kost [sic] body language and speech to give me reasonable suspicion to ask for consent to search [the motorcycle].")). A jury, viewing the body camera recording and hearing live testimony, is best situated to evaluate Cotto's claims and determine whether he did indeed have specific, articulable facts supporting reasonable suspicion to prolong the stop. In other words, a jury is best situated to determine whether Cotto had an "objectively logical path of deduction" leading from "objective fact[s] . . . contextually or inherently suggestive of criminal activity" to "reasonable suspicion of criminal activity"—or whether Cotton impermissibly "impute[d] criminality to a lawful range of behavior." *Monsivais*, 848 F.3d at 362. At

this stage, Cotto has not excluded the possibility that he acted on a hunch alone to call the canine unit or otherwise prolong the stop past the time necessary to perform the typically required tasks.[9] *See Rodriguez*, 575 U.S. at 354–55; *Pack*, 612 F.3d at 350.

The Fifth Circuit's decision in *Monsivais*, discussed above, is instructive. In that case, officers approached Monsivais as he walked on the side of a highway "away from an apparently disabled truck." 848 F.3d at 356. Monsivais did not stop to speak with them and continued walking. *Id.* The officers asked him a number of questions and later testified that he "appeared nervous and jittery, but was polite in responding to the questions" and that he "repeatedly put his hands in his pockets, but took them out each time at [the officer's] request." *Id.* After a few minutes, the officers patted Monsivais down for "officer safety reasons." *Id.* The Fifth Circuit concluded that "the totality of the circumstances prior to [the officers'] announcement of a pat-down did not point to any reason to suspect Monsivais of criminal activity." *Id.* at 361. It held that the government had "failed to satisfy its burden under *Terry* of pointing to specific and articulable facts warranting reasonable suspicion that Monsivais had committed, was committing or was about to commit a criminal act prior to his seizure." *Id.* at 363. "[N]o objectively logical process . . . justifie[d] interpreting the range of Monsivais's behavior as reasonably suspected criminal conduct." *Id.*

Here, the body camera recording shows that Kost's conduct, taken in the light depicted by the recording and in the light most favorable to Kost as the nonmoving party, did not approach the level of atypical or suspicious behavior held to *not* give rise to reasonable suspicion in *Monsivais*. Instead, Cotto "attempts to put an ominous gloss on what appears almost entirely ordinary." *United States v. Hill*, 752 F.3d 1029, 1034 (5th Cir. 2014). Kost did not put his hands in his pockets except

---

[9] Cotto argues that because Kost later consented to a search of his motorcycle—by Cotto, not by a canine unit—the extension of the stop to wait for the canine unit was "reasonable." (Mot. Summ. J., Dkt. 16, at 8–10). But because the Court determines that there are genuine disputes of material fact as to whether Cotto had reasonable suspicion to search the motorcycle at all, let alone call a canine unit, Kost's apparent consent (after his initial denial) does not weigh in Cotto's favor.

when Cotto asked him to retrieve something from them. He promptly responded to all of Cotto and

the unnamed officer's questions. Though *Monsivais* concerned the propriety of the initial stop—an

undisputed question in this case—its principles concerning the deduction of reasonable suspicion

still apply. Because Cotto, as the moving party, cannot establish to the exclusion of all genuine

disputes of material fact that the totality of the circumstances gave rise to reasonable suspicion, he is

not entitled to summary judgment on the issue of whether he acted objectively reasonably.

### 3.  Searching Kost's Pockets

Similarly, Cotto is not entitled to summary judgment on the issue of whether his frisk of

Kost and requests to Kost to remove items from his pockets were objectively reasonable. A jury is

best situated to evaluate whether Cotto had the specific, articulable facts necessary to establish

reasonable suspicion that Kost was armed and dangerous. *See Johnson*, 555 U.S. at 330; *Terry*, 392 U.S.

at 24. While Cotto did not have to be certain that Kost was armed, he must still establish that a

"reasonably prudent man could believe, based on 'specific and articulable facts, that his safety or that

of others [was] in danger" to be granted summary judgment on this issue. *Tuggle*, 284 F. App'x at

223. The Court finds that because the "specific and articulable facts" Cotto has alleged supported

his judgment are inconsistent with the body camera recording, Cotto has not met this burden.[10]

Cotto's actions while searching Kost's pockets do not support a finding that Cotto

reasonably believed he and the unnamed officer were in danger for purposes of summary judgment.

As Kost points out, Cotto repeatedly encouraged Kost to remove items from his pockets, even after

Kost told him that he had a pocketknife. (*See* Resp. Mot. Summ. J., Dkt. 19, at 15). Cotto's own

decisions hinder a finding that Cotto reasonably believed that his safety, that of the unnamed officer,

or that of any passers-by was in danger. True, traffic stops are more dangerous than many other

---

[10] Though the unnamed officer, who drew his gun, apparently believed Kost could have been armed, Kost's
claims concern Cotto's conduct.

police activities. *See Johnson*, 555 U.S. at 330. But Cotto was nevertheless required to draw on specific, articulable facts to justify frisking Kost, especially when considering that Cotto's "unquestioned command of the situation" "minimized" any harm Kost posed to Cotto or anyone else on the scene. *Id.* After feeling something that he thought "could be a weapon," he had not ruled out the possibility that the object could be a weapon and so was permitted to examine it further. (Body Camera Recording, Def.'s Ex. 2, at 4:25–4:31); *see Duvall*, 1999 WL 684140, at *3. But the import of Cotto's conjecture that the object could be a weapon is weakened when considering that Cotto allowed and even ordered Kost to remove the object from his pocket. If Cotto indeed believed that the object could pose a threat to him and the unnamed officer when it was readily accessible to Kost, his decision to allow Kost to immediately handle the object is difficult to parse.[11]

### B. Clearly Established Law

Next, the Court evaluates whether Cotto would have had fair notice from clearly established law that his actions were unreasonable, based on the evidence viewed in the light most favorable to Kost. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). While "clearly established law" is not to be defined "at a high level of generality," the law is properly considered clearly established on a given topic if "existing precedent . . . [has] placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Essentially, an officer must have "fair notice" that his actions would result in the violation of a constitutional right. *Hope*, 536 U.S. at 739. Still, "specificity is

---

[11] In his reply, Cotto rhetorically asks whether Kost would "rather have had Trooper Cotto rummaging through his pockets." (Reply Mot. Summ. J., Dkt. 21, at 1–2). Kost's wishes are largely immaterial to this analysis. Instead, the question is whether Cotto has established that there is no genuine dispute of material fact about whether he acted objectively reasonably leading up to and during his frisk of Kost.

especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

The Court finds that the law directly applicable to the situation Cotto confronted was clearly established in the Supreme Court and the Fifth Circuit well in advance of the traffic stop. Here, the salient question is whether the circumstances with which Cotto was confronted constituted specific, articulable factors giving rise to reasonable suspicion to prolong the traffic stop and frisk Kost. *See Anderson*, 483 U.S. 635, 640–41 (1987) (discussing the required degree of specificity for "clearly established law"). Rules squarely addressing those circumstances and the procedures available to Cotto were in place: those about the proper scope and duration of the stop,[12] *see, e.g.*, *Rodriguez*, 575 U.S. at 354–55; *Pack*, 612 F.3d at 350, about nervousness as a pertinent but not overriding factor for developing reasonable suspicion, *see, e.g.*, *Wardlaw*, 528 U.S. at 124; *Monsivais*, 848 F.3d at 359; *Pack*, 612 F.3d at 345–61, and about how an officer might permissibly develop reasonable suspicion at all, *see, e.g.*, *Terry*, 392 U.S. at 27; *Monsivais*, 848 F.3d at 357–63. Therefore, Cotto is not entitled to summary judgment on his argument that a lack of clearly established law existed to alert him to potentially unconstitutional conduct. He had ample notice that his actions during the traffic stop could legitimately be considered objectively unreasonable. Ultimately, he is not entitled to qualified immunity at this stage in the litigation.

---

[12] Indeed, Cotto's own comments during the stop reflect his understanding of the law on this issue. (*See, e.g.*, Body Camera Recording, Def.'s Ex. 2, Dkt. 16-3, at 16:07).

## IV.  CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that Cotto's motion for summary judgment, (Dkt. 16), is **DENIED**.


**SIGNED** on May 5, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE